IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

VALERIE WILLIAMSON, :
:
    Plaintiff, :
:
v. : Civil Action No. 15-035-RGA
:
CAROLYN COLVIN, Acting :
Commissioner of Social Security :
:
    Defendant. :

**MEMORANDUM OPINION**

---

Valerie Williamson, Wilmington, Delaware; Pro Se Plaintiff.

Nora Koch, Acting Regional Chief Counsel, Social Security Administration, Office of the General Counsel, Philadelphia, Pennsylvania; Lauren Donner Chait, Assistant Regional Counsel, Office of the General Counsel, Philadelphia, Pennsylvania; Charles M. Oberly, III, United States Attorney for the District of Delaware, Wilmington, Delaware; Heather Benderson, Special Assistant United States Attorney, Office of the General Counsel, Philadelphia, Pennsylvania, Attorneys for Defendant.

January 4, 2016
Wilmington, Delaware

ANDREWS, U.S. District Judge:

Plaintiff, Valerie Williamson, who appears *pro se*, appeals the decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). 42 U.S.C. §§ 401- 434. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g). Presently pending before the Court are cross-motions for summary judgment filed by Williamson and the Commissioner. (D.I. 14, 15).

## I. BACKGROUND

### A. Procedural History

Williamson filed an application for DIB on March 9, 2010, alleging disability as of December 11, 2008. (D.I. 12-5 at 2-8). Williamson's application was initially denied on September 3, 2010 (D.I. 12-4 at 2-6) and upon reconsideration on July 1, 2011. (D.I. 12-3 at 11-16). Hearings took place before an Administrative Law Judge (the "ALJ") on January 3 and April 2, 2013.[1] (D.I. 12-2 at 31-80). During the April 2, 2013 hearing, testimony was provided by Williamson and a vocational expert ("VE"). The ALJ issued a decision on May 22, 2013, finding that Williamson was not disabled. (*Id.* at 13-24). Williamson sought review by the Appeals Council (*id.* at 7-9), Williamson submitted additional records (D.I. 12-20 at 68-76), and her request was denied on November 18, 2014, making the ALJ's decision the final decision of the Commissioner. (D.I. 12-2 at

---

[1] No testimony was taken during the January 3, 2013 hearing. (D.I. 12-2 at 65). Williamson was advised of her right to representation, but she appeared at both hearings without the assistance of a representative.

2-6). On January 13, 2015, Williamson filed the current action for review of the final decision. (D.I. 2).

### B. Plaintiff's Testimony

Williamson was 49 years old when she testified at the April 2, 2013 hearing. (D.I. 12-2 at 33).[2] She is married and has a minor child living at home. (*Id.* at 35). She has a four-year college degree. (*Id.* at 36). Williamson has past relevant work experience as a customer service and payment research clerk, bank service worker, loan processor, credit card analyst, and processing clerk. (*Id.* at 36-38).

Williamson testified that she became unable to work following a 2008 motor vehicle accident.[3] She is unable to drive long distances or sit or stand for "too long," but is able to drive when she is not in pain, and drove herself to the hearing. (*Id.* at 35, 39). Williamson has neck, back, and knee injuries, Type II diabetes, a thyroid condition, high cholesterol, uses a CPAP machine, and sleeps less than eight hours a night. (*Id.* at 39, 46, 47). Williamson smokes and uses Albuterol, a prescription inhaler. (*Id.* at 53).

Williamson has daily neck pain that moves all over her body and causes severe headaches. (*Id.* at 40). She rates the pain as nine with pain medication. (*Id.* at 41). Her physician is increasing her pain medication. (*Id.*). Williamson also has daily back pain below her beltline that moves down her buttocks, down both legs, and both feet go

---

[2]Individuals under the age of 50 are generally considered to be capable of adjusting to other work. 20 C.F.R. § 404.1563(c).

[3]Plaintiff was involved in an automobile accident in 2008 and she returned to work in September 2009. (D.I. 12-2 at 38). She was involved in a second automobile accident on October 29, 2009. (*Id.*).

2

numb. (*Id.* at 42, 46). In addition, Williamson has severe back spasms. (*Id.* at 43). She rates her back pain at 10 with pain medication. (*Id.*).

Williamson is right-hand dominant. (*Id.* at 43). She had surgery on her left hand, has pain, and testified that she needs another surgery. (*Id.*). Williamson also had arthroscopic surgery on her right shoulder in 2008, testified that it still hurts, has sharp severe pain, and it "locks up." (*Id.* at 43-44). Williamson explained that she can move her right arm around, "it just hurts real bad." (*Id.* at 44). Williamson injured her left arm in the second car accident and testified that she was treated with injections. (*Id.* at 45). She has left knee pain that is treated with Lidoderm patches, and she was administered knee injections. (*Id.* at 47). Williamson takes pain medication for headaches, as well as medication for anxiety and depression, including Soma, Flexeril, Trazodone, Tramadol, and Xanax. (*Id.* at 41). The medication causes nausea, dizziness, and sleepiness. (*Id.* at 51).

Williamson testified that she has a mental health condition, has breakdowns, and sees dead people and talks to them. (*Id.* at 46, 49). She received psychiatric treatment at Harmonious Minds and takes Wellbutrin. (*Id.* at 48). She was unable to continue with psychiatric treatment because her spouse's insurance would not cover the treatment. (*Id.* at 48). Williamson also testified to long term memory lapse. (*Id.* at 53).

Williamson testified that she is unable to walk more than 15 minutes, can stand for 15 minutes, cannot sit for more than 45 minutes, cannot bend forward at the waist, and cannot kneel. (*Id.* at 51-52). She can lift less than five pounds. (*Id.* at 52). Williamson testified that she is able use a pen to make a grocery list, can hold a spoon

or fork and feed herself, but it hurts to brush her teeth. (*Id.*) She is unable to open a jar, is barely able to hold a steering wheel, but is able to open a car door and a doorknob. (*Id.* at 52-53).

With regard to activities of daily living, Williamson testified that she was able to care for her hygiene needs two out of seven days, her family makes the meals but she is able to make a sandwich, she does some cleaning chores, she is able to shop and carry light bags, she eats out at restaurants, and is able to take care of her finances when she can remember. (*Id.* at 54-55). Williams does not have any hobbies and does not attend social events. (*Id.* at 55-56). She described a typical day as lying down and watching television in the morning and afternoon followed by getting fresh air outside, and shopping. (*Id.* at 56).

### C. Plaintiff's Medical History, Condition, and Treatment

#### 1. *Medical Evidence*

An MRI of the lumbar spine in May 2009 revealed mild biforaminal disc bulging; mild disc bulging at L4-5; and mild disc degeneration and disc bulging at L3-4. (D.I. 20-7 at 70). October 2009 x-rays of the left shoulder, left elbow, left knee, and lumbar spine were all normal. (D.I. 20-8 at 5-8). A December 2010 MRI of the lumbar spine indicated mild degenerative disc disease at L5-S1 with associated facet hypertrophy, and no stenosis. (D.I. 12-15 at 71). A January 2010 EMG and nerve conduction studies of the bilateral lower extremities were normal with no lumber radiculopathy. (D.I. 12-12 at 13).

Williamson's complaints of chronic pain were treated with medication, chiropractic care, and lumbar facet injections. (D.I. 12-7 at 5; D.I. 12-13 at 22-23; D.I. 12-14 at 24, 26, 35, 37; D.I. 12-15 at 85; D.I. 12-19 at 5, 8, 14, 18, 23, 30; D.I. 12-20 at 23-30). Medical records indicate that upon examination, Williamson walked with a normal gait, had good range of motion of the knee, no ligament instability, no significant swelling, and no joint line tenderness. (D.I. 12-19 at 30).

Physical examination notes from Delaware Valley Physical Medicine Associates from June 25, 2009 to March 18, 2010, indicate that Williamson presented as a well-developed, well-nourished female in mild distress, with decreased range of motion in both her shoulders and weakness in the left upper extremity. (D.I. 12-13 at 21-23). A February 3, 2011 neurological examination found Williamson well-developed, in no distress, and with normal strength throughout. (D.I. 12-13 at 21-23).

Williamson received chiropractic care on several occasions. (D.I. 12-7 at 44-53, 59, 66; 12-12 at 11-12; D.I. 20-21 at 28, 30). Chiropractor John J. Mahoney noted positive findings for the following tests: Jackson compression, shoulder depression, Derifield, Ely heel to buttock, Valsalva, Soto-Hall, distraction, Milgram, and straight leg raising, and Yeoman, as well as the presence of Minor's sign on the left side and a functional short leg on the right side. (D.I. 12-7 at 6-7, 10-19; D.I. 12-11 at 6-23; D.I. 12-12 at 2-8; D.I. 12-13 at 4-16; D.I. 12-14 at 29-31). Dr. Mahoney recommended an adjustable seat to reduce postural stressors. (D.I. 12-7 at 9)

On June 4, 2010 orthopedist Leo W. Raisis, M.D., released Williamson to return to work to light duty work status following her carpal tunnel release, with no repetitive

5

use of the left hand, no lifting over ten pounds, and no use of her shoulders at the shoulder level or above. (D.I. 12-19 at 16, 21, 23).

On June 15, 2011, state agency physician Darrin Campo, M.D., conducted a physical residual functional capacity ("RFC") assessment with primary diagnoses of carpal tunnel syndrome left hand and chronic neck and left shoulder pain and secondary diagnoses of non-insulin dependent diabetes mellitus and depression. (D.I. 12-13 at 54). Dr. Campo opined that Williamson could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and push and/or pull a limited amount in the upper extremities. (*Id.* at 55). He further opined that Williamson had manipulative limitations; should not climb ladders, ropes, and scaffolds; but could frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. (*Id.* at 57). Finally, Dr. Campo opined that Williamson should avoid concentrated exposure to extreme temperatures, humidity, and vibration, and avoid moderate exposure to hazards. (*Id.* at 58).

### 2. *Mental Health Evidence*

On June 23, 2011, Douglas Fugate, M.D., reviewed Williamson's medical records, stated that Williamson did not allege depression, and opined that there was no medically determinable mental impairment. (D.I. 12-13 at 62). Williamson was seen by various medical providers whose notes for August 17, 2010, February 3, 2011, July 12, 2011, September 9, 2011, April 10, 2012, September 5, 2012, November 7, 2012, March 4, 2013, and March 27, 2013 indicate she suffers from depression and anxiety, at times severe. (D.I. 12-15 at 10, 18, 20, 40; D.I. 12-16 at 17; D.I. 12-20 at 55, 57, 62).

Medical records from Harmonious Minds, LLC, indicate that Williamson was seen on October 12, 2011 and diagnosed with a major depressive disorder, single episode, severe without psychotic features, chronic. (D.I. 12-20 at 16, 69). She was prescribed Wellbutrin, Trazadone, and Xanax. (*Id.*). She was next seen on November 7, 2011, and notes indicate that she was taking a lot of controlled medication that probably camouflaged the depression symptoms. (*Id.* at 18, 70-71). When she was seen on December 8, 2011, Williamson was again assessed as depressed and continued with the same diagnosis. (*Id.* at 19-20). Williamson was discharged on March 20, 2012, when she did not present for a follow-up.[4] (*Id.* at 20, 72).

As of March 27, 2013, Williamson's generalized anxiety disorder was stable, and she was to continue her medications. (D.I. 12-20 at 67). However, when she presented to Harmonious Minds on April 26, 2013, she was given a provisional diagnosis of major depressive disorder, single episode, severe with psychotic features.[5] (*Id.* at 73). On May 9, 2013, Williamson continued to have dreams, voices of others waking her, difficulty sleeping, and she was agitated and confrontational. (*Id.* at 74). The plan was to alternate the medications of Wellbutrin with Seroquel. (*Id.*).

---

[4]Williamson testified that she was supposed to see another psychiatrist and did not have insurance coverage but, effective May 1, 2013, would again have coverage through her spouse. (D.I. 12-2 at 47).

[5]This record was submitted to the Appeals Council on November 6, 2013, after issuance of the ALJ's decision. Records submitted with Williamson's motion for summary judgment indicate that, as of September 17, 2014, she continued with the provisional diagnoses of major depressive disorder, single episode, severe with psychotic features. (D.I. 14 at 18).

### C. The ALJ's Decision

The ALJ found that Williamson met the insured status requirements of the Act through December 31, 2014 and that she had not engaged in substantial gainful activity since December 11, 2008, the alleged onset date. (D.I. 12-2 at 15). The ALJ determined that Williamson had degenerative disc disease in the cervical and lumbar spines, bilateral carpal tunnel syndrome, and bilateral shoulder disorders, impairments that were severe, but that did not meet or equal the criteria of any of the listed impairments. (*Id.* at 16-17). The ALJ found that Williamson had the RFC to perform light work, except she must avoid pushing, pulling and working overhead with both arms; can frequently perform handling, fingering and feeling; can do no climbing of ropes, ladders, and scaffolds; can perform posturals occasionally; and must avoid concentrated exposure to extreme temperatures, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. (*Id.* at 19). Finally, the ALJ found that Williamson was able to perform her past relevant work as a customer service clerk, bank customer service worker, loan processor, credit card analyst, and processing clerk and that the foregoing work does not require the performance of work-related activities precluded by Williamson's RFC. (*Id.* at 12).

### II. LEGAL STANDARD

### A. Standard of Review

This Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a

preponderance of the evidence but more than a mere scintilla of evidence. See *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. See *Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. See *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2011). "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D. Pa. 2001) (citations omitted).

The Third Circuit has explained that a:

> single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 143 (3d Cir. 1983). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. See *Monsour*, 806 F.2d at 1190-91.

9

## B. Disability Determination Process

Title II of the Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). To qualify for DIB, the claimant must establish that he or she was disabled prior to the date he or she was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if [the individual's] physical or mental impairment or impairments are of such severity" that the individual is precluded from performing previous work or "any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

To determine whether an individual is disabled, the Commissioner must employ a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in substantial gainful activity, the claimant is not disabled. *Id.* If the claimant

10

is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is not suffering from a severe impairment or a combination of impairments that is severe, the claimant is not disabled. *Id.*

If the claimant's impairments are severe, step three requires the Commissioner to compare the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listings, the claimant is presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments or impairment combination are not listed or medically equivalent to any listing, then the analysis continues to steps four and five. 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (quoting *Burnett v. Commissioner of Soc. Sec. Admin.*, 220 F.3d 112, 131 (3d Cir. 2000)). "The claimant bears the burden of demonstrating an inability to return to [his or] her past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is able to return to his or her past relevant work, the claimant is not disabled. *See id.*

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the impairments preclude the claimant from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating "not disabled" finding if claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits.[6] *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id*. In making this determination, the Commissioner must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the assistance of a vocational expert is often sought. *See id.*

## III.  DISCUSSION

Williamson raises several objections. She argues that she has been unable to sustain employment due to her cognitive and other impairments since her two motor vehicle accidents, she meets listings 12.03 and 12.06, and she cannot return to her past work based on the circumstances listed in step 4 or any other work based on circumstances listed in step 5. Williamson argues that she has significant anxiety and severe neck and back pains and seems to contend that the Appeals Council erred in not considering the evidence she submitted in support of her request for review.

---

[6]The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five. *Smith v. Commissioner of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010).

12

Conversely, the Commissioner contends that substantial evidence supports the decision that Williamson is not disabled.

While Williamson does not specifically state it, she seems to generally allege that the ALJ should have considered the evidence that was before the Appeals Council. Because Williamson proceeds *pro se*, that is sufficient. As explained by the Third Circuit,

> [W]e tend to be flexible when applying procedural rules to pro se litigants, especially when interpreting their pleadings. *See, e.g., Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011) ("The obligation to liberally construe a *pro se* litigant's pleadings is well-established."). This means that we are willing to apply the relevant legal principle even when the complaint has failed to name it. *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003). And at least on one occasion, we have refused to apply the doctrine of appellate waiver when dealing with a pro se litigant. *Tabron v. Grace*, 6 F.3d 147, 153 n.2 (3d Cir. 1993). This tradition of leniency descends from the Supreme Court's decades-old decision in *Haines v. Kerner*, [404 U.S. 519] (1972). In *Haines*, the Court instructed judges to hold *pro se* complaints "to less stringent standards than formal pleadings drafted by lawyers." [*Id.* at 520]; *see Erickson v. Pardus*, [551 U.S. 89, 94] (2007).

*Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244 (3d Cir. 2013).

### A. Lack of Counsel and Duty to Develop the Record

"It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111 (2000). "Although the burden is upon the claimant to prove [her] disability, due regard for the beneficent purposes of the legislation requires that a more tolerant standard be used in this administrative proceeding than is applicable in a typical suit in a court of record where the adversary system prevails." *Hess v. Secretary of Health, Educ. & Welfare*, 497 F.2d

13

837, 840 (3d Cir. 1974). Accordingly, an ALJ must secure relevant information regarding a claimant's entitlement to social security benefits. *Id.* at 841.

In addition, "[w]hen a claimant appears at a hearing without counsel, the ALJ must 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Reefer v. Barnhart*, 326 F.3d 376 (3d Cir. 2003). The ALJ has a responsibility to assume a more active role when the claimant is unrepresented. *See Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979); *see also Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995) ("ALJs have a duty to develop a full and fair record in social security cases."). Finally, when a claimant has been informed of the right to counsel before an administrative hearing and knowingly waives it, the lack of representation is not, of itself, cause for remand. *See Dobrowolsky*, 606 F.2d at 407. Lack of counsel is sufficient cause for remand only if supported by a showing of clear prejudice or unfairness at the administrative hearing. *Domozik v. Cohen*, 413 F.2d 5, 9 (3d Cir. 1969).

After a review of the record, including the transcripts of both hearings, the Court concludes that Williamson was prejudiced by her lack of counsel and the inability to obtain her mental health records. Williamson told the ALJ during both hearings that she had received mental health treatment, but on both occasions the ALJ did not have the records.

At the January 3, 2013 hearing, the ALJ discussed with Williamson the advantages of having a representative appear with her at the hearing. (D.I. 12-2 at 66-67). Discussion was held with regard to the paucity of medical records in Williamson's

14

file. The ALJ stated, "we have no mental treatment notes at all in the file . . . I had no idea that you even had any mental problems or mental treatment . . . because I only know what's in the file". (*Id.* at 75). The ALJ asked Williamson when she began treatment for her mental health condition and whether her mental health condition prevented her from working and Williamson responded that it did. (*Id.* at 76).

The hearing was continued due to the lack of records and to give Williamson time to retain an attorney. The ALJ instructed Williamson to "get [] an attorney" and, if she needed assistance in obtaining treatment notes, to send the ALJ the names of doctors and dates of treatment so that subpoenas could issue. (*Id.* at 77).

During the April 2, 2013 hearing, Williamson testified that she had been treated by a mental health doctor and was told by the ALJ that "there's nothing in the file about that." (*Id.* at 48). Williamson told the ALJ that she had been advised the information had been requested, and the ALJ replied, "Ms. Williamson, what happened was the doctors never responded. . . . we don't have it and we can't get it so I don't know." (*Id.* at 49). The ALJ instructed Williamson "to go out and get it yourself and send it in . . . we sent things out and they didn't respond so there's not much that we can do . . . you were going to get a lawyer and the lawyer was going to take care of it and you didn't." (*Id.* at 50). The ALJ kept the record open after the hearing for the submission of additional records. (*Id.* at 51). It appears that the ALJ gave Williamson two weeks to obtain additional records. (*Id.* at 62).

15

The ALJ failed to sufficiently develop the record with regard to Williamson's mental health issues. See Plummer, 186 F.3d at 434 ("The ALJ has a duty to develop the record when there is a suggestion of mental impairment by inquiring into the present status of impairment and its possible effects on the claimant's ability to work."). The ALJ left the record open so that Williamson could obtain the records for submission and some were ultimately received. However, Williamson had difficulty obtaining the records and, given the ALJ's knowledge that Williamson had received mental health treatment and her testimony regarding her mental health state, the ALJ arguably should have pursued the possibility of a current mental RFC assessment.[7] Had Williamson had been represented by counsel, this possibility would probably have been pursued.

In addition, the transcript of the second hearing reveals that Williamson's attempt to challenge the conclusion of the VE was totally ineffective. Notably, the hypothetical posed to the VE did not include any aspect of Williamson's mental health condition (including her testimony of hallucinatory behavior[8]) or her complaints of pain, yet Williamson did not challenge the failure to include them in the hypothetical. In addition, when Williamson was asked if she had any questions for the VE, she attempted to pose a combined question/statement that went unanswered by VE and that the ALJ appears

---

[7] The June 23, 2011 mental RFC assessment in the record states that Williamson did not allege depression and there was no medically determinable mental impairment. (D.I. 12-13 at 62). The ALJ properly assigned little weight to the mental RFC assessment in view of the records received after the hearing, as the records constituted substantial evidence that the mental RFC assessment was wrong.

[8] The ALJ's opinion matter of factly recites that Williamson "testified to seeing and talking to dead people, having an imaginary friend, having breakdowns, long-term memory lapses and being forgetful; however, the record does not support these functional limitations." (D.I. 12-2 at 16).

to have considered (not unreasonably) as a statement by Williamson, as shown by the ALJ's response, "All right. Now is there anything else you want to tell me, Ms. Williamson." (D.I. 12-2 at 60). Had Williamson been represented, the deficiencies in the hypothetical to the VE would certainly have been pursued by any competent representative.

Because the aspect of Williamson's mental health was not adequately considered by the ALJ, coupled with Williamson's lack of counsel at the hearing, the Court finds that the matter should be remanded. On remand, the ALJ should consider a renewed mental RFC assessment of Williamson based upon all of Williamson's medical records and then decide whether the RFC should be reformulated to address additional mental limitations. Should the RFC be altered, this will require the ALJ to consider step five of the sequential evaluation process based on the new RFC.

### B. Sentence Six

Remand may also be appropriate if a claimant produces new and material evidence that was not before the ALJ. When the Appeals Council denies review, evidence that was not before the ALJ may only be used to determine whether it provides a basis for remand under sentence six of 42 U.S.C. § 405(g) ("Sentence Six"). See Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Sentence Six requires a remand when evidence is "new" and "material" if the claimant demonstrated "good cause" for not having incorporated the evidence into the administrative record. Id. In order to be material, "the new evidence [must] relate to the time period for which benefits were denied, and [must not] not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously

17

non-disabling condition." *Id*. The relevant time period is "the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. § 404.970(b); *Mathews*, 239 F.3d at 592. The materiality standard "requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." *Szubak*, 745 F.2d at 833.

The evidence submitted to the Appeals Council is new and material as it contains a provisional diagnosis of a major depressive disorder, single episode, severe with psychotic features[9] and refers to Williamson as agitated and confrontational, neither of which were before the ALJ and which could have changed the ALJ's decision.[10] *See Puterbaugh v. Colvin*, 2015 WL 4730068, at *11 (M.D. Pa. 2015) (Treating physician opinion submitted to the Appeals Council was new and material because "[t]he Regulations and Third Circuit case law, as described above, also place heavy emphasis on opinions from treating sources. Thus, a treating source opinion that Plaintiff could not perform . . . work raises a reasonable possibility that the outcome would be different.") (citing *Mathews*, 239 F.3d at 592). In addition, the records related to the time period for which benefits were denied. Finally, the Court finds good cause for Williamson's not having incorporated the records earlier, given the difficulty in obtaining records and the lack of an attorney to assist her.

---

[9] Williamson was previously diagnosed as "without psychotic features."

[10] The ALJ noted Williamson's brief treatment at Harmonious Minds and her discharge on March 20, 2011 when she did not return for follow-up, without consideration that Williamson was unable to continue treatment due to lack of insurance coverage. (*See* D.I. 12-2 at 48).

18

In arguing against a Sentence Six remand, the Commissioner focuses on the records Williamson submitted with her motion for summary judgment, and not the records submitted to the Appeals Council. The Court finds that remand is appropriate pursuant to Sentence Six for the ALJ to consider the evidence submitted to the Appeals Council and, particularly, the mental health records dated prior to the ALJ's May 22, 2013 decision.

### IV.  CONCLUSION

For the reasons stated, the decision of the Commissioner is vacated, and this case is remanded for further proceedings. Williamson's motion for summary judgment (D.I. 11) is denied to the extent that she seeks judgment in her favor and granted to the extent that she seeks a remand, and the Commissioner's cross-motion for summary judgment (D.I. 13) is denied.

A separate order will be entered.